UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

TONY CORONA,

                    Plaintiff,

        v.

NANCY A. BERRYHILL[1]
*Acting Commissioner, Social Security
Administration,*

                  Defendant.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
15-CV-7117 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Tony Corona filed the above-captioned action pursuant to 42 U.S.C. § 405(g)

seeking review of a final decision of the Commissioner of Social Security (the "Commissioner")

denying his claim for supplemental security income under the Social Security Act (the "SSA").

Plaintiff moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure, claiming that Administrative Law Judge Kieran McCormack (the "ALJ") erred

by improperly weighing the evidence in determining Plaintiff's residual functional capacity

("RFC") and improperly assessing Plaintiff's credibility.  (Pl. Mot. for J. on the Pleadings,

Docket Entry No. 9; Pl. Mem. in Supp. of Pl. Mot. ("Pl. Mem."), Docket Entry No. 10.)  Plaintiff

also argues that the Appeals Council failed to consider new and material evidence.  (*Id.*)  The

Commissioner cross-moves for judgment on the pleadings, arguing that the Court should affirm

the ALJ's decision because it is supported by substantial evidence.  (Comm'r Cross-Mot. for J.

_____

    [1]  Pursuant to Fed. R. Civ. P. 25(d), the caption has been updated to reflect the new
Acting Commissioner of Social Security, Nancy A. Berryhill, who took office on January 23,
2017.

on the Pleadings, Docket Entry No. 12; Comm'r Mem. in Opp'n to Pl. Mot. and in Supp. of Comm'r. Cross-Mot. ("Comm'r Mem."), Docket Entry No. 13.) For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is granted, the Commissioner's cross-motion for judgment on the pleadings is denied, and the case is remanded for further proceedings consistent with this Memorandum and Order.

## I. Background[2]

Plaintiff was born in 1981. (Certified Admin. Record ("R.") 23, 105, 370, Docket Entry No. 8.) Plaintiff has an eleventh-grade education. (R. 23.) Between 2001 and 2008, Plaintiff was employed part-time through a temporary staffing service, where he loaded and unloaded trucks, programed cellular telephones and performed other warehouse work. (R. 48–49, 106–07, 119–20, 411, 429–31.) Plaintiff has not worked since approximately January of 2008 because of a physical injury. (R. 17–18.) On February 4, 2013, Plaintiff applied for supplemental security income benefits, alleging disability as of February 4, 2013 because of a learning disability, anger problems, depression, problems sleeping and pain in the left side of the neck, middle of the back and left arm.[3] (R. 218, 410.) Plaintiff's application was denied after initial review, and he requested a hearing before an ALJ. (R. 245–50, 261.) Plaintiff appeared with his attorney before ALJ Valorie Stefanelli on May 1, 2014.[4] (R. 99–143.) By decision dated May 14, 2014, ALJ

---

[2] Plaintiff does not dispute the ALJ's findings related to his physical impairments, therefore the summary of the record includes only facts relevant to Plaintiff's alleged mental impairments. (Pl. Mem. 2 n.4.)

[3] Plaintiff also applied for disability benefits under Title II of the SSA, however, Plaintiff withdrew that application at his May 1, 2014 hearing, (R. 104), and the Appeals Council subsequently dismissed Plaintiff's request for hearing on his Title II claim. (R. 157–58.)

[4] Plaintiff also appeared before ALJ Stefanelli on November 26, 2013, but the hearing was adjourned so that Plaintiff could obtain counsel. (R. 144–55.)

Stefanelli determined that Plaintiff was not disabled and denied Plaintiff's application. (R. 219–40.) Plaintiff appealed ALJ Stefanelli's decision and on August 5, 2014, the Appeals Council remanded the case so that additional testimony could be obtained from a vocational expert. (R. 241–44.) Plaintiff appeared with his attorney before the ALJ on December 9, 2014. (R. 31–97.) By decision dated January 21, 2015, the ALJ determined that Plaintiff was not disabled and denied Plaintiff's application. (R. 10–30.) Plaintiff appealed the ALJ's decision and on November 2, 2015, the Appeals Council denied review of the ALJ's decision. (R. 1–7.) Plaintiff commenced this action on December 14, 2015. (Compl., Docket Entry No. 1.)

### a. Plaintiff's testimony

#### i. May 1, 2014 hearing

During the May 1, 2014 hearing before ALJ Stefanelli, Plaintiff testified that he was last employed in 2008. (R. 105–06.) Plaintiff worked for approximately five-to-six months for a warehouse, where his duties included loading and unloading trucks and programming cellular telephones with an automatic upload. (R. 106–07, 120.) Plaintiff performed his warehouse work independently, only interacting with his manager. (R. 121–22.) Plaintiff ceased working in 2008 because he was injured on his way to work when he slipped on ice and fell. (R. 107–08.) Plaintiff testified that but-for his injury, he would be able to work his prior warehouse job but later in the hearing explained that he might have difficulty attending work regularly because of "everything I've been through, like I'm just tired of everything." (R. 112, 131.) Plaintiff then discussed his mental impairments, which caused him to "stop[] caring about anything." (R. 113.) Plaintiff witnessed a very close friend's murder in the summer of 2011 and participated as a witness during the criminal conviction of the shooter. (R. 113–14.)

When ALJ Stefanelli asked Plaintiff when his mental impairments began, he explained

that his mother told him he had a "learning problem" when he was a child and that even when he was working he was unhappy about everything else in his life. (R. 115, 119.) Plaintiff estimated that he retreated from social contact in 2009. (R. 115–16.) Plaintiff avoids people when he goes outside, and he suffers from panic attacks when he is close to people. (R. 118, 121.) Plaintiff has trouble sleeping. (R. 118.) Plaintiff has a weak appetite, causing him to go days without eating at some points and, as a result, he has lost between twenty and thirty pounds since 2011. (R. 125–26.) He has anger issues, mostly with people in his neighborhood that knew about the shooting of his good friend, but he walks away from them when he begins to become upset. (R. 128–29.) Plaintiff also expressed difficulty with concentrating, social interactions and memory.[5] (R. 132.) Plaintiff lives with his mother and sister but often does not interact with them and stays in his room where he watches television or uses his computer. (R. 115, 118.) His mother does the household chores, laundry, shopping and cooking. (R. 133.) Plaintiff was homeless for a period of time approximately one year before the ALJ hearing. (R. 123.)

Plaintiff began treatment for his mental impairments in 2013, after his family and friends encouraged him to seek treatment and apply for disability benefits. (R. 130.) Plaintiff sees

---

[5] Plaintiff completed a function report as part of his application for supplemental security income benefits on February 21, 2013. (R. 416–28.) Plaintiff was homeless at the time and stayed with different friends. (R. 416.) Plaintiff spent his time watching television, on his computer or outside and also spent "a lot" of time with others either in person or talking through electronic media and attending parties or movies with friends. (R. 417, 421.) Plaintiff traveled by public transportation. (R. 419.) He helped care for his father and would travel to his medical appointments. (R. 417.) Plaintiff complained that he barely slept and was forgetful. (R. 417–18.) Plaintiff explained that some of his family and friends did not care about him "much" because he has "a lot of anger problem[s]" and "a lot of stress" and "hate." (R. 421, 424.) Plaintiff explained that when he becomes angry he takes a walk alone and smokes a cigarette. (R. 425.) He indicated he had problems paying attention, remembering things and completing tasks and that he could only "sometimes" follow spoken and written instructions. (R. 423–24.) Plaintiff explained that he has trouble "getting along" with authority figures and has lost a job because of his inability to get along with others, explaining that he does not "like to obey or be told to do things" that he does not want to do. (R. 423.)

therapist Jennifer Salto, LMSW, biweekly. (R. 114.) Plaintiff sees psychiatrist Faisal Chaudhry, M.D., once every three to four weeks. (R. 114.) Plaintiff explained that he discussed medications with his psychiatrist but that pain medication previously caused him to become sick, so he is not currently taking any psychiatric medications. (R. 116–17.)

### ii. December 9, 2014 hearing

During a December 9, 2014 hearing before the ALJ, Plaintiff reiterated that he worked part-time through temporary employment agencies between 2001 and 2008 until he fell and was injured on his way to work in 2008. (R. 48–50.) Plaintiff was diagnosed with depression and post-traumatic stress disorder ("PTSD"), which he has suffered from since he "was younger." (R. 58.) Plaintiff does not take any psychiatric medications. (R. 58.) Plaintiff suffered from dizziness as a side effect of pain medication. (R. 58.) Plaintiff continued to see Dr. Chaudhry but said of the treatment, "it's not really doing nothing." (R. 59.)

Plaintiff explained that he struggled with sleep and would sleep at odd times of the day as a result. (R. 60.) Plaintiff only sleeps between three and four hours at a time. (R. 60–61.) Plaintiff spends most of his time in his room watching television or on his computer unless he has an appointment. (R. 62–63.) He often does not feel like eating. (R. 62.) Plaintiff occasionally goes to the store, but if he sees a crowd in the store he will not enter. (R. 64.) When Plaintiff socializes with friends he does not talk, and his friends inquire whether something is wrong. (R. 64.) Plaintiff becomes anxious in crowds, even sometimes of two or three people, and he has anxiety and panic attacks. (R. 67.) He could not identify any specific triggers that result in the anxiety or panic attacks. (R. 68.) Plaintiff has not been hospitalized for

a panic attack.[6]  (R. 69.)

### b.  Vocational expert testimony

In relevant part, the vocational expert testified during the December 9, 2014 hearing that a person with Plaintiff's physical limitations is limited to low stress work, defined as requiring no more than simple, routine, repetitive tasks with few, if any, workplace changes and only occasional interactions with supervisors, co-workers and/or the general public.  The vocational expert testified that such a person could work as a marker, domestic laundry worker or laminating machine off-bearer.  (R. 72–74.)  The vocational expert testified that the jobs he found available for someone of Plaintiff's RFC limitation were jobs "working basically alone, that you wouldn't be working in tandem with anyone else."  (R. 76.)  The same jobs would be possible for someone who was limited to "only casual non-intense contact with others."  (R. 81.)  However, an individual who could not have casual non-intense contact or could not deal with a supervisor or had to work completely alone, could not perform any work.  (R. 83, 87, 88–89.)  Similarly, an individual who would be absent from work two or three times during a month would not be able to sustain work.  (R. 93–94.)

### c.  Mental health medical evidence

#### i.  Woodhull Medical and Mental Health Center

On April 24, 2013, Plaintiff went to Woodhull and told them that he needed a doctor for

---

[6]  The ALJ left the record open for thirty days after the hearing for Plaintiff to submit additional records from Dr. Chaudhry.  (R. 47.)  Plaintiff's counsel requested the records twice, on September 24, 2014 and October 30, 2014, but did not receive them.  (R. 46.)  Counsel told the ALJ that the ALJ likely would not need to issue a subpoena to obtain the records because counsel had not previously experienced difficulties in obtaining records from Woodull Medical and Mental Health Center ("Woodhull").  (R. 47.)  No additional records were submitted. (R. 20.)

social security disability.  (R. 538.)  Plaintiff explained that he felt depressed and had a poor appetite and previously had thoughts of suicidal ideation.  (R. 539.)  On prior occasions, Plaintiff self-inflicted wounds to ease his stress then began substituting tattoos and body piercing to ease his stress.  (R. 539.)  Plaintiff scored sixteen on the PHQ9,[7] indicating moderately severe depression.  (R. 668–69.)  Plaintiff was examined by Anastasia Asanov, M.D., who assessed major depressive disorder and explosive personality disorder.  (R. 540.)  Plaintiff appeared alert and oriented to time, place and person and was not in acute distress.  (R. 539.)  Dr. Asanov recommended anti-depressant medication, but Plaintiff declined.  (R. 540.)  Dr. Asanov referred Plaintiff to Woodhull's unit for social work and behavioral medicine.  (R. 540.)

The next day, April 25, 2013, Plaintiff was evaluated by Jennifer Felsher, LMSW. (R. 675.)  Plaintiff was found to be in a "depressed mood, blunted affect" but otherwise was alert and oriented as to time, place and person and denied having suicidal or homicidal ideations and hallucinations.  (R. 675.)  Plaintiff denied prior suicide attempts.  (R. 675.)  Plaintiff scored nineteen on the PHQ9.  (R. 675.)  Plaintiff reported loss of interest, depressed mood, anger, lack of energy, poor appetite, loneliness, forgetfulness and anxiety.  (R. 675.)  Plaintiff declined psychiatric medication.  (R. 676.)

On June 3, 2013, Marie Josee Cadet, a Nursing Assistant for Woodhull, noted in Plaintiff's screening that during the past two weeks he had "not had less interest and/or pleasure in doing things" and had "not been feeling down, depressed and/or hopeless."  (R. 689.)  Plaintiff

---

[7] "The PHQ-9 is the nine item depression scale of the Patient Health Questionnaire, which is completed by the patient and assists primary care clinicians in diagnosing depression as well as selecting and monitoring treatment. The PHQ-9 is based directly on the diagnostic criteria for major depressive disorders in the *Diagnostic and Statistical Manual Fourth Edition* (DSM-IV), *available at*, http://www.depressionprimarycare.org/clinicians/toolkits/materials/forms/phq9/." *Scott v. Colvin*, No. 14-CV-7331, 2016 WL 5173252, at *4 n.5 (E.D.N.Y. Sept. 21, 2016).

returned to Woodhull on June 13, 2016 to request the completion of his social security disability forms and was again examined by Dr. Asanov.  (R. 544, 546.)  Plaintiff appeared alert and oriented to time, place and person and was not in acute distress.  (R. 545.)  Plaintiff denied suicidal or homicidal ideations.  (R. 546.)  Dr. Asanov diagnosed Plaintiff with major depressive disorder and explosive personality disorder.  (R. 546.)  Dr. Asanov recommended a follow-up with a psychiatrist.[8]  (R. 546.)

### 1.   Jennifer Sartor, LMSW

On Plaintiff's psychiatric outpatient initial questionnaire for Woodhull, completed on June 11, 2013, Plaintiff indicated feelings of loneliness, depression, anger, hostility and difficulty trusting others.  (R. 653.)  Jennifer Sartor, LMSW, completed Plaintiff's social work screening.  (R. 655.)  Plaintiff reported his history with self-harm as well as his education and work history.  (R. 655.)  Plaintiff presented as "somewhat guarded," but his affect was appropriate and his speech logical.  (R. 655.)  Sartor reported Plaintiff's judgment as poor, impulsivity as fair and his eye contact as "o.k."  (R. 655.)  Plaintiff denied suicidal or homicidal ideations.  (R. 655.)

On July 8, 2013, Sartor conducted an individual psychotherapy session with Plaintiff.  (R. 656.)  Sartor noted that Plaintiff presented as "somewhat withdrawn" but was otherwise alert and oriented to time, place and person and denied perceptual disturbances.[9]  (R. 656.)  Plaintiff

---

[8]  During visits to Woodhull on September 9, 2013, September 18, 2013, November 15, 2013 and December 3, 2013, Plaintiff indicated that during the past two weeks he had "not had less interest and/or pleasure in doing things" and had "not been feeling down, depressed and/or hopeless."  (R. 702, 703, 707, 711.)  Plaintiff was oriented to time, place and person and was not in acute distress when he saw Dr. Asanov on September 18, 2013.  (R. 626.)

[9]  Except as otherwise noted, Sartor made the same findings concerning Plaintiff's alertness and orientation to time, place and person and denial of perceptual disturbances, suicidal and homicidal ideations or failed to make any findings relating to Plaintiff's orientation and alertness and disturbances during her subsequent treatment notes.

reported that he was doing "o.k." (R. 656.) Plaintiff denied suicidal or homicidal ideations. (R. 656.) Sartor completed a psychosocial assessment on the same day, documenting Plaintiff's social history. (R. 648–49.)

Plaintiff met with Sartor again on July 23, 2013 and her findings were largely consistent with those on July 8, 2013, except that Sartor noted that Plaintiff appeared calm and included a diagnosis of major depressive disorder. (R. 657.) On August 1, 2013 and August 27, 2013, Plaintiff met with Sartor again and her findings were consistent except that Plaintiff presented as "detached" on August 1, 2013 and indicated he was "doing well" on August 27, 2013. (R. 658–59.) On September 17, 2013, Plaintiff was "more expressive than [in the] prior session." (R. 660.) Plaintiff expressed hesitation and anxiety about testifying at the upcoming criminal trial of the person who killed his friend. (R. 660.) On October 3, 2013, Plaintiff reported to Sartor that he testified during the trial and the defendant was convicted.[10] (R. 661.)

On November 14, 2013, it appears that Sartor[11] completed a Treating Physician's Wellness Plan Report. (R. 594–95.) Sartor provided an interim diagnosis of mood disorder, not otherwise specified, and PTSD but noted that Plaintiff was scheduled for bi-weekly psychotherapy sessions and had an appointment scheduled with Dr. Chaudhry for December 23,

---

[10]   On October 16, 2013, Plaintiff presented as calm and explained that he felt detached "most of the time." (R. 661.) Plaintiff met with Sartor on November 14, 2013, December 6, 2013 and December 23, 2013, and continued to present as calm but expressed frustration and indifferences about his life circumstances and loneliness. (R. 662–63.) During his December 23, 2013 meeting, Plaintiff expressed anger that he was unable to work. (R. 663.) On January 9, 2014, Plaintiff presented as depressed but otherwise Sartor reported findings similar to those of Plaintiff's prior sessions. (R. 665.)

[11]   The signature on the form is not decipherable, but the license number appears to match that of Sartor. (R. 595, 833.)

2013.  (R. 594.)  The form indicated that more information was needed to determine Plaintiff's

ability to work.[12]  (R. 594.)

## 2.  Faisal Chaudhry, M.D.

On February 27, 2014, Dr. Chaudhry, Plaintiff's psychiatrist, examined Plaintiff.  (R.

837.)  Dr. Chaudhry's mental status examination revealed that Plaintiff was withdrawn, had a

depressed and anxious mood, had "poor" short-term memory.  (R. 837.)  Dr. Chaudhry found

that Plaintiff's attention, concentration, "ability to abstract," eye contact, insight and judgment

were "fair" while his long-term memory and impulse control were "good."  (R. 837.)  Plaintiff

did not have any suicidal or homicidal ideations and he was alert and oriented with a full, non-

labile affect.  (R. 837.)  Dr. Chaudhry assigned Plaintiff a global assessment of functioning

("GAF") score of "53/55."[13]  (R. 837.)  Dr. Chaudhry indicated that Plaintiff's "history of

trauma" has created symptoms including "disturbed sleep, nightmares and hypervigilance."  (R.

837.)

On February 28, 2014, Dr. Chaudhry completed a Treating Physician's Wellness Plan

Report.  (R. 756–57.)  Dr. Chaudhry diagnosed Plaintiff with moderate recurrent major

depressive disorder and PTSD as of June 11, 2013 based on clinical findings of depressed and

---

[12]  During the December 9, 2014 ALJ hearing, Plaintiff's attorney said that the December 23, 2013 appointment was likely Plaintiff's first treatment session with Dr. Chaudhry.  (R. 38.)

[13]  The GAF score is a numeric scale ranging from "0" (lowest functioning) through "100" (highest functioning). "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'"  *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, at 32 (4th ed. 2000)).  "A GAF between 51 and 60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).'"  *Id.* (quoting *Diagnostic and Statistical Manual of Mental Disorders*, at 34).

anxious mood, clammy hands and constricted affect. (R. 756.) Dr. Chaudhry also included in his clinical findings that Plaintiff did not have suicidal or homicidal ideations, was alert and oriented and made fair eye contact. (R. 756.) Plaintiff had begun a course of psychotherapy treatment but was not prescribed any psychotropic medications. (R. 756.) Dr. Chaudhry opined that Plaintiff would not be able to work for at least twelve months. (R. 757.)

On April 24, 2014, Sartor completed a Psychiatric Impairment Questionnaire that Chaudhry signed. (R. 826–33.) The questionnaire listed Plaintiff's first treatment date as June 11, 2013. (R. 826.) Plaintiff was diagnosed with prolonged PTSD based on a mental health examination. (R. 826–27.) Plaintiff scored a fifty-five on the GAF. (R. 826.) The report indicated clinical findings of poor memory, sleep and mood disturbance, social withdrawal or isolation, recurrent panic attacks, anhedonia or pervasive loss of interests, intrusive recollections of a traumatic experience, feelings of guilt/worthlessness and hostility and irritability. Sartor noted the most severe or frequent findings were Plaintiff's anxiety and depression. (R. 827–28.) Plaintiff's symptoms included depression, anxiety in crowds, irritability, impulsivity, sleep disturbance and panic attacks. (R. 828.)

Dr. Chaudhry then measured Plaintiff's limitations as to four non-exertional categories: (1) understanding and memory, (2) sustained concentration and persistence, (3) social interactions, and (4) adaption.[14] (R. 829–31.) Dr. Chaudhry opined that there was no evidence that Plaintiff's understanding and memory were limited. (R. 829.) As to sustained concentration and persistence, Dr. Chaudhry opined that Plaintiff was "mildly limited" in his ability to sustain

---

[14] The form that Dr. Chaudhry used defined "mildly limited" as "not significantly affect[ing] the individual's ability to perform the activity;" "moderately limited" as "significantly affect[ing] but [] not totally preclud[ing] the individual's ability to perform the activity;" and "markedly limited" as "effectively preclud[ing] the individual from performing the activity in a meaningful manner." (R. 828.)

ordinary routine without supervision and make simple work-related decisions; "moderately limited" in his ability to maintain attention and concentration for extended periods, complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace without rest periods that were unreasonable in both number and length; and "markedly limited" in his ability to work in coordination with or proximity to others without being distracted by them. (R. 829.) As to social interactions, Dr. Chaudhry opined that Plaintiff was limited in each capacity. (R. 830.) Plaintiff was "moderately limited" in his ability to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (R. 830.) Plaintiff was "markedly limited" in his ability to interact appropriately with the general public and his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (*Id.*) As to adaptation, Plaintiff was "mildly limited" in his ability to respond appropriately to changes in the work setting and set realistic goals or make plans independently. (R. 830–31.)

Dr. Chaudhry indicated that Plaintiff experiences episodes of deterioration or decompensation in work or work-life settings that cause him to withdraw and/or experience exacerbation of symptoms, explaining that Plaintiff "has difficulty around other[s] which leads to isolating behavior." (R. 831.) Dr. Chaudhry opined that Plaintiff was capable of tolerating "low stress" work. (R. 831.) Dr. Chaudhry also opined that Plaintiff's symptoms likely would produce "good" and "bad" days and Plaintiff likely would miss about two or three days of work each month. (R. 832–33.) Dr. Chaudhry repeated the most limiting of the findings in a December 8, 2014 letter and indicated that Plaintiff had been in his care since April of 2013. (R. 846.)

### ii. Consultative examiner – Sally Morcos, Psy. D.[15]

On March 1, 2013 Plaintiff was examined by consultative psychiatrist Sally Morcos, Psy.

D.  (R. 521–25.)  Plaintiff reported his prior work history and indicated that he had a learning

disability but had completed the tenth grade[16] with special education courses.  (R. 521.)  Plaintiff

explained that he had not worked since 2008 and that he was not currently able to work because

his arm hurt and he had an "anger problem."  (R. 521.)  Plaintiff reported that he was able to use

public transportation, clean his laundry at a laundromat and shop and manage money.  (R. 521,

524.)  Plaintiff explained that he was homeless and stayed with friends.  (R. 521.)

Plaintiff denied any psychiatric hospitalizations or outpatient treatment.  (R. 521.)

Plaintiff reported trouble sleeping, loss of appetite resulting in an unknown amount of weight

loss, headaches, frequent sweating, short-term memory deficits, negative thinking and "a lot of

hate and anger."  (R. 521.)  Plaintiff explained that since "he was young," he has seen shadows

and sometimes hears sounds "like someone is sitting next to him."  (R. 521.)  Plaintiff attempted

suicide in 2012 and last experienced suicidal ideations a few months before the appointment but

---

[15]  The record also includes opinions from two additional consultative examiners about
Plaintiff's mental impairments.  On March 11, 2013, Plaintiff was examined by orthopedic
consultative examiner, Chaim Shtock, D.O.  (R. 515–18.)  Plaintiff explained that he was
homeless and stayed at his friends' houses but that he could do his own laundry and could do
"light shopping" independently.  (R. 515.)  Plaintiff reported a history of depression and anger
problems "since school" and a poor memory but was not on any medication.  (R. 515.)  Dr.
Shtock, in relevant part, listed a reported history of depression, stress and anger problems in his
diagnosis, and indicated Plaintiff's prognosis was "guarded."  (R. 517.)  On April 25, 2013, state
agency psychiatrist consultant C. Anderson, M.D., reviewed Plaintiff's records and opined that
Plaintiff's allegations of learning disability, anger problems and depression are "partially
credible allegations."  (R. 204.)  Dr. Anderson indicated there was "no evidence of marked
functional impairments due to a psychiatrist impairment."  (R. 204.)  Dr. Anderson opined that
Plaintiff was able to "understand, concentrate, remember, adapt, relate, and persist with tasks on
a sustained basis."  (R. 204.)

[16]  The ALJ's decision indicates that Plaintiff completed his education through eleventh
grade.  (R. 23.)

was not experiencing suicidal ideations at the time of the appointment.  (R. 522.)  Plaintiff reported homicidal ideations focused on the person who murdered his friend but he did not have any concrete plans.  (R. 522.)  Dr. Morcos contacted emergency services and had Plaintiff transferred to Long Island College Hospital for further risk assessment based on his homicidal ideations.  (R. 522.)

Dr. Morcos performed a mental status examination and found Plaintiff cooperative and that he "presented with adequate social skills."  (R. 523.)  Plaintiff appeared well groomed; presented with normal posture and behavior; maintained appropriate eye contact; delivered intelligible, expressive and receptive speech; presented with a coherent and goal directed thought process without evidence of hallucinations, delusions or paranoia; presented an appropriate affect, neutral mood and clear sensorium; and had intact attention and concentration as well as intact recent and remote memory skills.  (R. 523.)  Dr. Morcos reported poor insight and poor judgment.  (R. 523–24.)

Dr. Morcos diagnosed Plaintiff, in relevant part, with adjustment disorder with disturbance of conduct and her prognosis was "guarded," given Plaintiff's feelings of anger, hate and the absence of treatment.  (R. 524–25.)  Dr. Morcos opined that Plaintiff can follow and understand simple directions and instructions; perform simple tasks independently; maintain attention, concentration and a normal schedule; and learn new tasks and perform complex tasks with supervision.  (R. 524.)  Dr. Morcos opined that Plaintiff was limited in that he cannot make appropriate decisions, relate with others, or appropriately deal with stress because of his "poor coping skills."  (R. 524.)  Dr. Morcos recommended psychological therapy to help Plaintiff improve his coping skills.  (R. 525.)

### iii. FEDCAP evaluation

On October 7, 2013, Plaintiff was evaluated by FEDCAP Rehabilitation Services, Inc.

("FEDCAP"), a non-profit organization. (R. 566.) As part of FEDCAP's evaluation, Plaintiff

was examined by Mehjabeen Ahmed, M.D.[17] (R. 579–591.) Plaintiff described a history of

depression, violent behavior, poor concentration and inability to "be around other people."

(R. 579.) Plaintiff denied appetite or weight changes and did not indicate any memory problems.

(R. 581, 584.) Plaintiff was referred for a psychiatric examination.[18] (R. 588.) The comments

from the psychiatric exam included: chronic mood disorder, probable bipolar disorder not

otherwise specified, panic disorder with agoraphobia, claustrophobia, possible attention deficit

hyperactivity disorder/attention deficit disorder by history, rule-out PTSD with flashbacks

related to recently witnessing the murder of a friend, and rule-out personality disorder not

otherwise specified. (R. 591–92.) The psychiatric evaluator diagnosed episodic mood disorders,

anxiety, dissociative and somatoform disorders. (R. 593.) The evaluator recommended

psychiatric treatment with medication in liquid form, weekly psychotherapy sessions and training

to help Plaintiff adjust his behavior and manage stress and anger. (R. 592.) On October 9, 2013,

Dr. Ahmed completed a Wellness Plan Summary Re-Exam Form in which he indicated that

---

[17] Case manager Maria Skelton completed Plaintiff's FEDCAP intake evaluation. (R. 566.) Plaintiff explained that he travels independently by bus and subway. (R. 568.) Plaintiff reported problems with depression and anxiety and indicated that he was meeting with a therapist twice a month. (R. 569–70.) Plaintiff "cut[] himself" in the past but indicated that he has since substituted tattoos to ease his emotional pain. (R. 571.) Plaintiff indicated past suicidal ideations and attempts but denied any past homicidal ideations. (R. 571.) Plaintiff denied hearing voices, seeing things, having bizarre beliefs or exhibiting any other unusual behaviors. (R. 571.) Plaintiff indicated that he previously received special education but did not recall the type of special education. (R. 574.) Skelton observed that Plaintiff was alert and responsive during the interview. (R. 575.)

[18] The record does not indicate the name of the doctor who completed the exam.

Plaintiff's non-exertional work limitations included cognitive, emotional and interpersonal limitations as detailed in the psychiatric report. (R. 821.) The FEDCAP evaluation concluded that Plaintiff was unable to work for at least ninety days. (R. 802.)

### d. The ALJ's decision

The ALJ incorporated by reference the discussion of the medical evidence and hearing testimony contained in ALJ Stefanelli's prior decision as part of the final decision. (R. 20.) The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the SSA.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since February 4, 2013, the date that Plaintiff identified as the onset of his disability. (R. 16.) At step two, the ALJ found that Plaintiff had the following severe impairments: internal derangement of the left shoulder and osteoarthritis in the cervical spine, major depressive disorder and PTSD. (R. 16.) The ALJ found that Plaintiff's obesity and past history of cannabis use were non-severe and his low back impairment was not medically determinable. (R. 16.) At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet, or are equal to, the severity of one of the impairments listed in Appendix 1 of the Social Security Regulations. (R. 17.) At step four, the ALJ found that Plaintiff has the mental RFC to perform:

> low stress jobs, defined as jobs containing no more than simple, routine, and repetitive tasks; involving only simple work related decision; with few, if any, workplace changes, with few decisions made while performing work; and where he is not exposed to crowds, has no requirement to interact with the general public to perform work duties, and where there is only casual non-intense contact with others necessary to perform the work duties.

(R. 19.) The ALJ considered Exhibits 23F through 25F, which were not previously considered by ALJ Stefanelli, and determined that they "do not provide any additional support, or basis, for a finding of disability." (R. 20.)

In assessing the opinion evidence, the ALJ assigned "great weight" to most of the opinions of Dr. Chaudhry, Plaintiff's treating psychiatrist, including Plaintiff's "marked limitations in terms of interacting with others, such as co-workers or the general public" and the otherwise "wide range of functionality in work-related activities." (R. 21.) The ALJ considered Dr. Chaudhry's GAF score assessment of fifty-five, his conservative psychiatric treatment regimen and the lack of medication and hospital visits to treat Plaintiff's condition and concluded that Dr. Chaudhry, "as a treating specialist, has depicted a consistent picture of [Plaintiff's] residual mental capacities." (R. 21.) The ALJ gave "lesser weight" to Dr. Chaudhry's finding that Plaintiff likely would be absent from work between two to three times per month because:

> [t]his particular limitation does not appear to be reasonably related to any other findings in Dr. Chaudhry's questionnaire, or in the psychiatric treatment records from Woodhull, which do not show significant symptom flares occurring two to three times per month that would cause the claimant to lose an entire day of work each time.[19]

(R. 21.)

The ALJ assigned "little weight" to the opinions of Dr. Morcos, the psychological consultative examiner, who found Plaintiff could not make appropriate decisions, relate with others or appropriately deal with stress. (R. 22.) The ALJ found that such limitations "appear to

---

[19] The ALJ also gave "little weight" to the conclusory opinions of Dr. Chaudhry and Ms. Sartor that Plaintiff was unable to work for at least twelve months. (R. 21.) The ALJ gave "[s]ome weight" to Dr. Shtock's opinion but rejected Dr. Shtock's opinions regarding Plaintiff's limited use of his left hand and moderate bending limitations of the low back and did not discuss Dr. Shtock's psychiatric findings. (R. 21.) The ALJ gave "little weight" to the opinion of the FEDCAP program physician. (R. 22.) Plaintiff does not appear to challenge these findings.

have been based solely on the homicidal ideation that the claimant expressed to Dr. Morcos," which were "not repeated to any other source within this record." (R. 22.) The ALJ reasoned that Dr. Morcos' other mental status examinations produced findings "largely within normal limits," concluding that "Dr. Morcos' own report, as well as the specific conclusions of Dr. Chaudhry, do[] not support" the limitations Dr. Morcos ascribed to Plaintiff.[20] (R. 22.)

After reviewing the medical evidence and Plaintiff's testimony, the ALJ concluded that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. 20.) The ALJ explained that Plaintiff's allegations that his combination of ailments cause him to be unable to work "are not supported by medical evidence obtained in the record," citing exhibits 5A, 23F and 25F. (R. 20–21.)

The ALJ determined that Plaintiff's mental RFC was "mostly supported by Dr. Chaudhry's determinations in the April 2014 questionnaire, in terms of limiting contact with co-workers and the general public, and restricting the claimant from a range of potentially stressful workplace situations." (R. 22.) The ALJ found, however, that the need to be absent from work between two or three times a month was "not supported by the objective evidence in file or by the [Plaintiff's] conservative course of treatment." (R. 22.)

Finally, the ALJ determined that Plaintiff has no past relevant work, but concluded that based on Plaintiff's age, education, work experience and RFC, "there are jobs that exist in significant numbers in the national economy" that Plaintiff can perform, including work as a

---

[20]   The ALJ also gave "[l]ittle weight" to the opinion of the state agency psychiatric consultant. (R. 22.) Plaintiff does not dispute this finding. (Pl. Mem. 11 n.13.)

marker, laundry-domestic, or laminating machine off-bearer as found by the vocational expert. (R. 23–24.)  The ALJ therefore determined that Plaintiff had not been suffering from a "disability" since February 4, 2013 as this term is defined under the SSA.  (R. 24.)

### e. Evidence submitted to the appeals council – Ronald Sherman, Ph.D. and Dr. Chaudhry

In appealing the ALJ's decision to the Appeals Council, Plaintiff submitted an evaluation by psychologist Ronald Sherman, Ph.D. based on an examination from June 12, 2015, which post-dated the ALJ's disability decision.  (R. 189–91.)  Dr. Sherman completed a mental status examination and found Plaintiff alert and oriented to time, place and person with clear relevant, goal-directed speech and organized thought content.  (R. 190.)  Plaintiff had a depressed and anxious mood, sad affect and intrusive recollection of traumatic events.  (R. 190.)  Plaintiff denied suicidal or homicidal ideations and hallucinations.  (R. 190.)  Plaintiff's concentration and attention to detail were "poor" and his insight and judgment were "fair."  (R. 190.)  Dr. Sherman diagnosed Plaintiff with depressive disorder, not otherwise specified, PTSD and attention deficit disorder with childhood onset hyperactivity.  (R. 190.)  Dr. Sherman gave Plaintiff a GAF score of forty-seven.  (R. 190.)  Dr. Sherman opined that Plaintiff was totally disabled and unable to function in any job in any capacity and that the severity of his disability existed since February 1, 2013.  (R. 191.)

Dr. Sherman also completed a Mental Impairment Questionnaire on the same day.  (R. 192–97.)  Dr. Sherman noted "moderate," "moderate-to-marked" and "marked" for all of Plaintiff's mental functions.[21]  (R. 195.)  Dr. Sherman found Plaintiff to have "marked"

---

[21]  The form used by Dr. Sherman defined "moderate" as symptoms occasionally interfering with ability up to one-third of an eight hour workday; "moderate-to-marked" as symptoms frequently interfering with ability up to two-thirds of an eight hour workday; and

limitations in understanding and remembering detailed instructions, accepting instructions from authorities and getting along with coworkers or peers without distracting them. (R. 195.) Dr. Sherman also found Plaintiff to have "marked" limitations in ten out of fourteen of the categories regarding concentration and persistence, and adaptation. (*Id.*) Dr. Sherman opined that Plaintiff's symptoms would last at least twelve months and Plaintiff was likely to be absent from work more than three times per month. (R. 192.)

Plaintiff also submitted a narrative psychiatric impairment questionnaire from Dr. Chaudhry that was created on August 24, 2015, after the ALJ's disability decision. (R. 185–88.) Dr. Chaudhry recounted Plaintiff's medical treatment at Woodhull, including: his social and medical history; his PTSD symptoms of flashbacks, nightmares and hypervigilance; depression and anxiety symptoms including anhedonia, amotivation, depressed mood, depressed affect, insomnia, low energy, low self-esteem and guilty thoughts/feelings; poor concentration; suicidal ideation "with specific thoughts most days (usually without plan or active intent);" uncontrollable worries about various life stressors; restlessness; difficulty relaxing; irritability; and fear that something awful is about to happen. (R. 185, 186–88.) Dr. Chaudhry's assessment was based on "clinical evaluations and observation[s] in the treatment process and [Plaintiff's] self-report." (R. 186.) Dr. Chaudhry also recounted Plaintiff's recent psychotherapy sessions with Lindsay Meissner, LMSW, in July and August of 2015. (R. 186.) Plaintiff scored a twenty-five on the PHQ9 administered on July 21, 2015, indicating severe-acute major depression, and was assessed a GAF score of fifty. (R. 185, 186.) Plaintiff was prescribed an oral solution of antidepressant Citalopram, but Dr. Chaudhry reported noncompliance because

---

"marked" as symptoms constantly interfering with ability more than two-thirds of an eight hour workday. (R. 195.)

Plaintiff reported that he is "prone to headaches, vomiting and dizziness when taking any medication." (R. 186.) Dr. Chaudhry explained that Plaintiff presented with constricted affect, depressed and anxious mood and frequent active suicidal ideation during their sessions. (R. 187.) Dr. Chaudhry opined that Plaintiff's primary diagnosis of Dysthymic Disorder is a milder, more chronic and insidious form of depression that can limit an individual's ability to engage in work when it is compounded with "co-occurring clinical issues" such as Plaintiff's PTSD. (R. 187.)

The Appeals Council declined to consider this additional evidence. The Appeals Council explained that Dr. Sherman examined Plaintiff for the first time on June 12, 2015, well after the ALJ's final decision on January 21, 2015 and the Appeals Council found "insufficient basis to project Dr. Sherman's observations and opinions backwards" to February 1, 2013. (R. 2.) The Appeals Council found Dr. Chaudhry's August 24, 2015 report duplicative of Dr. Chaudhry's December 8, 2014 letter (exhibit 25F), which the ALJ considered.[22] (R. 2.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence

---

[22] The Appeals Council erroneously referred to the new evidence submitted by Dr. Chaudhry as dated December 8, 2014 when the report was dated August 24, 2015. (R. 2, 184–88.) The Commissioner assumes this error resulted because the August 24, 2015 report was duplicative of the December 8, 2014 report, which was already in the record. (Comm'r Mem. 26 n.7.)

as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*,

805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971));

*McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court

"can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault*

*v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks

omitted). In deciding whether substantial evidence exists, the court "defer[s] to the

Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d

118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one

rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's

factual findings "must be given conclusive effect so long as they are supported by substantial

evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations

omitted). If, however, the Commissioner's decision is not supported by substantial evidence or

is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*,

3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).

"In making such determinations, courts should be mindful that '[t]he Social Security Act is a

remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'"

*McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008)

(alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b. Availability of benefits

Supplemental security income is available to individuals who are "disabled" within the

meaning of the SSA.[23] Federal disability insurance benefits are also available to individuals who

---

[23] Supplemental security income is available to individuals who are sixty-five years of age or older, blind or disabled and meet certain income requirements. 42 U.S.C. §§ 1382(a),

are "disabled" within the meaning of the SSA.  To be considered disabled under the SSA, a

plaintiff must establish his or her inability "to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment must be of

"such severity that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy."  *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner has

promulgated a five-step analysis for evaluating disability claims.  20 C.F.R. §§ 404.1520,

416.920.  The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to
> determine whether the claimant is presently employed.  If the
> claimant is not employed, the [Commissioner] then determines
> whether the claimant has a "severe impairment" that limits her
> capacity to work.  If the claimant has such an impairment, the
> [Commissioner] next considers whether the claimant has an
> impairment that is listed in Appendix 1 of the regulations.  When
> the claimant has such an impairment, the [Commissioner] will find
> the claimant disabled.  However, if the claimant does not have a
> listed impairment, the [Commissioner] must determine, under the
> fourth step, whether the claimant possesses the residual functional
> capacity to perform her past relevant work.  Finally, if the claimant
> is unable to perform her past relevant work, the [Commissioner]
> determines whether the claimant is capable of performing any other
> work.  If the claimant satisfies her burden of proving the
> requirements in the first four steps, the burden then shifts to the
> [Commissioner] to prove in the fifth step that the claimant is capable
> of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46

(2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential

---

1382c(a)(1)(A); 20 C.F.R. § 416.202.  The only issue before the Court is whether Plaintiff is
disabled.

evaluation for adjudication of disability claims, set forth at 20 C.F.R. § 404.1520"); *McIntyre*, 758 F.3d at 150 (describing "the five-step, sequential evaluation process used to determine whether a claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

### c. Analysis

#### i. The ALJ's RFC determination

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because he improperly weighed the opinions of Dr. Chaudhry and Dr. Morcos and failed to point to other medical evidence supporting the RFC assessment. (Pl. Mem. 11–16.) The Commissioner argues that the ALJ properly weighed the medical opinion evidence and properly accounted for Plaintiff's limitations in assessing Plaintiff a "very limited range of work." (Comm'r Mem. 16–23.)

##### 1. Treating physician rule

"[A] treating physician's statement that the claimant is disabled cannot itself be determinative." *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (same). But a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record."[24] 20 C.F.R. § 404.1527(c)(2); *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x

---

[24] The regulations define "treating source" as the claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (quoting 20 C.F.R. § 404.1502).

401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

If an ALJ declines to give a treating physician's opinion controlling weight, the ALJ must consider a number of factors to determine how much weight to assign to the treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2) and discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Halloran*, 362 F.3d at 32. While the ALJ is not required to explicitly discuss the factors, it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion . . . .").

## 2. Duty to develop the record

Before evaluating the weight assigned to a treating physician's opinion, the Court must assess whether the ALJ satisfied his threshold duty to adequately develop the record.[25] *Burgess*, 537 F.3d at 129 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))); *Collins v. Comm'r of Soc. Sec.*, No. 11-CV-5023, 2013 WL 1193067, at *9–10 (E.D.N.Y. March 22, 2013) (remanding for failure to develop the record); *Pabon*, 273 F. Supp. 2d at 514 ("[T]he duty to develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability . . . . Until he satisfies this threshold requirement, the ALJ cannot even begin to discharge his duties . . . under the treating physician rule." (alterations in original) (quoting *Peed v. Sullivan*, 78 F. Supp. 1241, 1246 (E.D.N.Y. 1991))).

The ALJ in *Selian* relied on a consultative examiner's opinion, which concluded that the claimant could lift objects "of a mild degree of weight on an intermittent basis." 708 F.3d at 421. The Second Circuit found this opinion "remarkably vague," and, as a result, the ALJ's analysis amounted to "sheer speculation." *Id.* Given the claimant's testimony to the contrary, "[a]t a minimum, the ALJ likely should have contacted [the physician] and sought clarification of his report." *Id.* (citing 20 C.F.R. § 404.1520b(c)(1)); *McClinton v. Colvin*, No. 13-CV-8904, 2015 WL 5157029, at *23 (S.D.N.Y. Sept. 2, 2015) ("In applying [20 C.F.R. § 416.920b(c)], . . . when the information needed pertains to the treating physician's opinion, the ALJ should reach

---

[25] The ALJ is "under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel." *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) (summary order); *see also Johnson v. Astrue*, 811 F. Supp. 2d 618, 629 (E.D.N.Y. 2011) (first citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999), and then citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).

out to that treating source for clarification and additional evidence."); *Gabrielsen v. Colvin*, No. 12-CV-5694, 2015 WL 4597548, at *6 (S.D.N.Y. July 30, 2015) ("[C]ourts in the Second Circuit have concluded, citing [40 C.F.R. §§ 404.1520b(c)(1), 16.920b(c)(1)], that the ALJ still has an obligation to re-contact the treating physician in some cases." (citing *Selian*, 708 F.3d at 421, and *Ashley v. Comm'r of Soc. Sec.*, No. 14-CV-40, 2014 WL 7409594, at *4 (N.D.N.Y. Dec. 30, 2014))); *see also Vazquez v. Comm'r of Soc. Sec.*, No. 14-CV-6900, 2015 WL 4562978, at *17 (S.D.N.Y. July 21, 2015) ("[T]he alteration of the regulations does not give the ALJ free rein to dismiss an inconsistency without further developing the record."); *Ashley*, 2014 WL 7409594, at *4 (finding that, despite having broad discretion to resolve conflicts, the ALJ should have contacted and sought clarification from the treating doctor instead of finding that "[i]t was not necessary to contact either [doctor to] clarify their opinions as their treating records lack the documentation that they could point to to support their opinions" (citing 40 C.F.R. §§ 404.1520b(c)(1), 16.920b(c)(1))); *Jimenez v. Astrue*, No. 12CV-3477, 2013 WL 4400533, at *11 (S.D.N.Y. Aug. 14, 2013) (noting that despite amendments to the social security regulations, "the regulations still contemplate the ALJ recontacting treating physicians when 'the additional information needed is directly related to that source's medical opinion'" (quoting How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651–01, 10,652 (Feb. 23, 2012))).

Failure to adequately develop the record is an independent ground for vacating the ALJ's decision and remanding for further findings. *See Rosa*, 168 F.3d at 83 (finding remand "particularly appropriate" where the ALJ failed to obtain adequate information from treating physicians and potentially relevant information from other doctors); *Craig v. Comm'r of Soc. Sec.*, --- F. Supp. 3d ---, --- 2016 WL 6885216, at *8 (S.D.N.Y. Nov. 22, 2016) ("Remand is appropriate where this duty is not discharged." (citing *Moran v. Astrue*, 569 F.3d 108, 114–15

(2d Cir. 2009)). However, even where an ALJ fails to develop the opinions of a treating physician, remand may not be required "where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC]." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013).

District courts have reached varying conclusions as to whether the ALJ can satisfy the duty by relying on the plaintiff's counsel to obtain the necessary records. *See Sotososa v. Colvin*, No. 15-CV-854, 2016 WL 6517788, at *4 (W.D.N.Y. Nov. 3, 2016) ("Where there is a gap in the record, however, district courts in this circuit have reached conflicting conclusions as to whether the ALJ satisfies that duty by relying on the claimant's counsel to obtain the missing evidence." (collecting cases)); *compare Myers ex rel. C.N. v. Astrue*, 993 F. Supp. 2d 156, 162–64 (N.D.N.Y. 2012) (finding the ALJ fulfilled the duty to develop the record where the plaintiff's counsel requested and received additional time to submit the records and submitted a different record) *with Harris v. Colvin*, No. 11-CV-1497, 2013 WL 5278718, at *7 (N.D.N.Y. Sept. 18, 2013) (finding the ALJ did not satisfy the duty to develop the record where the ALJ held the record open to allow the plaintiff's counsel to obtain the promised additional records but no records were submitted).

In two unpublished opinions, the Second Circuit discussed the extent of the duty and found it was satisfied where the ALJ did more than solely rely on the plaintiff's counsel to satisfy the duty to develop. *See Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 488 n.2 (2d Cir. 2012) (holding the ALJ's decision was based on a fully developed record because the ALJ requested submission of additional relevant evidence, held the record open subsequent to the administrative hearing, contacted counsel when no further evidence was received and granted counsel's request for an extension of time to obtain the evidence); *Jordan v. Comm'r of Soc.*

*Sec.*, 142 F. App'x 542, 543 (2d Cir. 2005) (affirming a district court's finding that an ALJ fulfilled his duty to develop the record where the plaintiff's counsel volunteered to secure the records, the record was left open, the ALJ reminded the plaintiff's counsel to submit the records, the plaintiff's counsel informed the social security administration that there were no further records to add, and the plaintiff's counsel did not request assistance from the ALJ in obtaining the records).

### 3. Non-treating physician

Under the statute, a "nontreating source" is defined as a "physician, psychologist, or other acceptable medical source who has examined [the plaintiff] but does not have, or did not have, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 416.902. In general, "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419. This is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990); *Hernandez v. Astrue*, 814 F. Supp. 2d 168, 182–83 (E.D.N.Y. 2011) ("[T]he opinion of a consultative physician, 'who only examined a plaintiff once, should not be accorded the same weight as the opinion of [a] plaintiff's treating psychotherapist.'" (quoting *Cruz*, 912 F.2d at 13)).

### A. Treating psychiatrist – Dr. Chaudhry

Dr. Chaudhry completed a questionnaire indicating, among other things, that Plaintiff likely would be absent from work two to three days a month and was "markedly limited" in the following ways: "[1] his ability to work in coordination with or in proximity to others without being distracted by them; [2] his ability to interact appropriately with the general public; and [3]

his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes." (Pl. Mem. 11 (citing R. 828–830).) The ALJ accorded the majority of Dr. Chaudhry's opinions "great weight" but afforded "lesser weight" to his opinion that Plaintiff likely would be absent form work about two to three times per month because of the absence of significant symptom flares in Plaintiff's medical records. (R. 21.)

Plaintiff raises two primary arguments challenging the ALJ's weighing of Dr. Chaudhry's opinion. First, Plaintiff argues that although the ALJ granted Dr. Chaudhry's opinion regarding Plaintiff's "marked" limitations "great weight," the ALJ in fact discounted the opinions without explanation because the RFC assessment did not "preclude" Plaintiff from working with others. (Pl. Mem. 11–12.) Second, Plaintiff argues that the ALJ erred by according only "little weight" to Dr. Chaudhry's opinion that Plaintiff would miss work two-to-three times a month without first fully developing the record and without pointing to contradictory evidence.[26] (Pl. Mem. 12–14.) The Commissioner argues the ALJ appropriately incorporated Dr. Chaudhry's opinion as to Plaintiff's limited ability to work with others into the RFC and properly discounted Dr. Chaudhry's opinion as to Plaintiff's likely absence from work two-to-three times per month because it was not supported by Plaintiff's conservative course of treatment and there was no evidence of "flare-ups" that might cause Plaintiff to miss work that frequently.[27] (Comm'r Mem.

---

[26] Plaintiff also argues that the absence of "exacerbations" while Plaintiff was not working and consistently under treatment does not indicate that Plaintiff would not require frequent absence from work. (Pl. Mem. 13.)

[27] The Commissioner also points to Dr. Chaudhry's conservative treatment and Plaintiff's GAF Score of fifty-five, among other record evidence, to support the argument that Plaintiff likely would not miss work between two and three times a month. (Comm'r Mem. 19–20.) Plaintiff argues that Dr. Chaudhry's conservative treatment and his GAF score of fifty-five do not support the Commissioner's argument. (Pl. Reply in Supp. of Pl. Mot. ("Pl. Reply") 2–4, Docket Entry No. 15.)

18–20.)  The Court addresses each argument below.

### (1)  The ALJ properly incorporated Dr. Chaudhry's opinions

Plaintiff's argument that the ALJ did not incorporate Dr. Chaudhry's finding that he could not "interact appropriately with the general public" into the RFC assessment is without merit.  The ALJ's RFC assessment explicitly limited exposure to crowds and included "no requirement to interact with the general public to perform work duties."  (R. 19.)  The ALJ explicitly noted that the RFC assessment took into account Dr. Chaudhry's opinion "in terms of limiting contact with . . . the general public."  (R. 19, 22.)

Similarly, as to the other two "marked" functional limitations, the ALJ noted that the RFC assessment accounted for "limiting contact with co-workers" based on Dr. Chaudhry's April 2014 questionnaire and accordingly limited the RFC to "only casual non-intense contact with others necessary to perform the work duties."  (R. 19, 22.)  The vocational expert testified that the jobs he found available for someone limited to "casual non-intense contact" were jobs "working basically alone, that you wouldn't be working in tandem with anyone else."  (R. 76, 81–82.)  The relevant limiting categories contemplated by Dr. Chaudhry to be "markedly" limited only measured Plaintiff's ability to work in coordination and in proximity to others, one of eight measures in concentration and persistence; and the ability to "get along" with co-workers or peers without distracting them or exhibiting behavioral extremes, one of five measures in social interaction.  (R. 829–30); *see, e.g.*, 20 C.F.R. Pt. 404, Appendix 1 of Subpart 1 of Subpart P § 12.00(C)(2) (noting that a variety of measures comprehensively make up the determination of the degree of a claimant's social function impairment at step two).  Dr. Chaudhry found between no limitation and only "moderate" limitation for Plaintiff's remaining concentration and persistence and social interaction categories.  (R. 829–30.)  Thus, the

"marked" limitation in only one aspect of social interaction as well as concentration and persistence does not mandate a finding that Plaintiff is "precluded" from interacting with others completely; rather, the RFC assessment accounts for the "great weight" the ALJ accorded to Dr. Chaudhry's opinion that Plaintiff is "markedly limited" in his ability to work in coordination or proximity to others and ability to get along with co-workers or peers without distracting them, since the RFC limits Plaintiff to casual non-intense contact with coworkers and no exposure to crowds or need to interact with the general public.

### (2) Duty to develop the record – Dr. Chaudhry

As to Plaintiff's second argument that the ALJ failed to accord "great weight" to Dr. Chaudhry's finding that Plaintiff likely would be absent from work two to three times in a month, the ALJ failed to adequately develop the record before discounting Dr. Chaudhry's opinion.[28]  The ALJ identified that the record did not include any treatment records from approximately one year of monthly visits with Dr. Chaudhry during the December 9, 2014 hearing.  (R. 40.)  However, despite the known gap in the record, the ALJ relied on the absence of "reasonably related" findings in Dr. Chaudhry's April 2014 questionnaire or the psychiatric treatment records from Woodhull showing significant symptom flares.  This was error.  *See Burgess*, 537 F.3d at 129 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record."); *Calzada v. Astrue*, 753 F. Supp.

---

[28]  The accuracy of the ALJ's conclusion that "[t]his particular limitations does not appear to be reasonably related to any other findings in Dr. Chaudhry's questionnaire," (R. 21), is undermined by the evidence in the record.  In the April 2014 questionnaire, Dr. Chaudhry noted that Plaintiff's impairments produced "good" and "bad" days and "episodes of deterioration or decompensation in work or work like settings which cause him to withdraw from that situation and/or experience exacerbation of signs/symptoms," which findings support that Plaintiff's symptoms were prone to "flare up."  (R. 831–32.)

2d 250, 278 (S.D.N.Y. 2010) (holding that, having identified a relevant gap in the record, "the ALJ committed legal error in failing [to] develop the record or seek clarification of the treating physicians' assessments before dismissing them as inadequately supported by the clinical findings").  Because Dr. Chaudhry was the only treating psychiatrist to provide opinions[29] as to Plaintiff's mental health limitations, and the ALJ identified missing records representing a year of monthly treatment, the ALJ cannot discredit his opinion based on lack of supporting evidence without first obtaining Dr. Chaudhry's treatment notes to determine whether his conclusions are supported.  *See, e.g.*, *Tavarez v. Barnhart*, 124 F. App'x 48, 50 (2d Cir. 2005) (remanding where ALJ improperly disregarded a treating physician's opinion testimony based on the absence of evidence without supplementing the record); *Rosa*, 168 F.3d at 79 (holding that prior to rejecting a treating physicians' diagnosis, an ALJ must first attempt to fill any clear gaps in the administrative record (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)); *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (remanding for development of the record where the ALJ discredited a treating physician's change of opinion that did not explicitly list supporting clinical findings because the ALJ failed to develop the record before discrediting the opinion); *Craig*, 2016 WL 6885216, at *12–13 (finding error where the ALJ failed to develop

---

[29] The importance of the duty to develop the record is particularly relevant here, since Plaintiff alleges mental illness.  *Craig v. Comm'r of Soc. Sec.*, --- F. Supp. 3d ---, --- 2016 WL 6885216, at *13 (S.D.N.Y. Nov. 22, 2016) ("The duty to develop the record is particularly important where an applicant alleges he is suffering from a mental illness, due to the difficulty in determining whether these individuals will be able to adapt to the demands or 'stress' of the workplace." (quoting *Merriman v. Comm'r of Soc. Sec.*, No. 14-CV-3510, 2015 WL 5472934, at *19 (S.D.N.Y. Sept. 17, 2015) (adopting report and recommendation)); *Piscope v. Colvin*, 201 F. Supp. 3d 456, 462 (S.D.N.Y. 2016) (noting that the obligation to develop the record is "enhanced when the disability in question is a psychiatric impairment" (quoting *Lacava v. Astrue*, No. 11-CV-7727, 2012 WL 6621731, at *11 (S.D.N.Y. Nov. 27, 2012)); *Gabrielsen v. Colvin*, No. 12-CV-5694, 2015 WL 4597548, at *3–4 (S.D.N.Y. July 30, 2015) (finding a heightened duty to develop the record in the case of a mental impairment) (collecting cases) (adopting report and recommendation).

the record by obtaining the treating physician's treatment notes and instead discounted the treating physician's opinion as "wholly unsupported by treatment records"); *Cammy v. Colvin*, No. 12-CV-5810, 2015 WL 6029187, at *16 (E.D.N.Y. Oct. 15, 2015) ("Nevertheless, even if [the treating physicians'] opinion was unclear, internally inconsistent, or in conflict with other medical opinions in the record, the ALJ failed to fulfill her duty to develop the administrative record by seeking additional information from the treating physicians to clarify or resolve such inconsistencies.").

As discussed above, the Second Circuit has not clearly described the extent of the ALJ's duty. However, in light of the investigative nature of the ALJ's duty to develop the record, *see Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011) ("The duty of the ALJ, unlike that of a judge at trial, is to 'investigate and develop the facts and develop the arguments both for and against the granting of benefits.'" (citing *Butts*, 388 F.3d at 386)), the Court finds that the ALJ did not satisfy her duty here. The ALJ's discussion on the record with Plaintiff's counsel regarding Dr. Chaudhry's treatment notes and her decision to leave the record open for thirty days for the submission of his records, (R. 41–47), were not sufficient to satisfy her duty because the ALJ took no further action to ensure that the record was complete, even though the ALJ was well aware that the record request had been outstanding since September 24, 2014, over two months before the hearing, (R. 46).[30] *See Newsome v. Astrue*, 817 F. Supp. 2d 111, 137–38

---

[30] Plaintiff's counsel may have some responsibility for the undeveloped record, which may become relevant in the event counsel requests attorneys' fees as a result of the remand. Counsel assured the ALJ that a subpoena was not needed in order to obtain the records, did not request assistance from the ALJ and has not offered an explanation for the absence of records. (R. 46–47.) *See Curtis v. Astrue*, No. 11-CV-786, 2012 WL 6098258, at *4 n.6 (N.D.N.Y. Oct. 30, 2012) (noting that where an attorney "promised to provide the records and then failed to follow up, a court might reasonably conclude that counsel bore primary responsibility for the deficiency." (citing *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir.2011)); *see also*

(E.D.N.Y. 2011) (finding the request for certain records from the plaintiff's attorney that were never received did not satisfy the ALJ's duty to develop the record); *Glast v. Astrue*, No. 11-CV-5814, 2013 WL 5532696, at *10 (E.D.N.Y. Sept. 30, 2013) (That the ALJ requested information from Plaintiff's attorney regarding two treating physicians and received nothing "does not relieve the ALJ of his duty to fully develop the record." (citations and internal quotation marks omitted)); *Curtis v. Astrue*, No. 11-CV-786, 2012 WL 6098258, at *4–5 (N.D.N.Y. Oct. 30, 2012) (finding that the ALJ did not satisfy his duty to develop the record by requesting that plaintiff's counsel supplement the record with treatment notes, even where counsel promised at the hearing to obtain the records, because no records were ever submitted).

Although the ALJ afforded the majority of Dr. Chaudhry's opinions "controlling weight," it was not harmless error for the ALJ to fail to develop the record before discounting Dr. Chaudhry's opinion as to the likelihood and frequency with which Plaintiff would be absent from work. The vocational expert testified that Plaintiff would not be able to sustain work if he would be absent two or three times a month, (R. 93–94), and the contents of Dr. Chaudhry's treatment notes may support Dr. Chaudhry's opinion regarding Plaintiff's absence from work. *See Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) (finding that it was not harmless error for an ALJ to discredit a treating physician's opinion regarding the plaintiff's likely absence from work where a vocational expert testified that the plaintiff could not perform jobs available in large numbers in the national economy if he had to miss four or more days of work per month); *cf. Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) ("Where application of the correct legal principles to

*Vincent*, 651 F.3d at 305 ("Because of the ALJ's duty to investigate, if counsel's entitlement to fees is questioned due to an undeveloped record, it must be clear that counsel bore primary responsibility for those deficiencies before the fee recovery is reduced.").

the record could lead only to the same conclusion, there is no need to require agency reconsideration." (internal quotations marks and alterations omitted)).  Accordingly, the Court remands for the ALJ to develop the record.[31]

### B.  Examining physician – Dr. Morcos

The state consultative psychology examiner, Dr. Morcos, found that Plaintiff could not make appropriate decisions, relate with others or appropriately deal with stress based on Plaintiff's poor coping skills, which appeared consistent with Plaintiff's stress-related problems. (R. 524.)  The ALJ accorded these opinions "little weight" because Dr. Morcos' observations "appear to have been based solely on the homicidal ideation" Plaintiff expressed during the examination, which were not supported by other record evidence.  The ALJ reasoned that Dr. Morcos' other mental status examinations produced findings "largely within normal limits," concluding that "Dr. Morcos' own report, as well as the specific conclusions of Dr. Chaudhry, do[] not support" the limitations Dr. Morcos ascribed to Plaintiff.  (R. 22.)

Plaintiff argues that the ALJ should have accorded "greater consideration" to Dr. Morcos' opinions because Dr. Morcos' other findings were consistent with the record and her

---

[31]  The Court does not address Plaintiff's remaining arguments challenging the ALJ's weighing of Dr. Chaudhry's opinion but notes that on remand, the ALJ should not discount Dr. Chaudhry's opinion only because his course of treatment was conservative.  The opinion of a treating physician is not to be "discounted merely because he has recommended a conservative treatment regimen."  *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (holding that the fact that a claimant took "only over-the-counter medicine to alleviate her pain" could support the conclusion that the claimant was not disabled only if such evidence was "accompanied by other substantial evidence" (citing *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000))); *see Holman v. Colvin*, No. 12-CV-5817, 2014 WL 941823, at *6 (S.D.N.Y. Mar. 11, 2014) (finding that an ALJ "erroneously rel[ied]" on evidence that reflected "solely conservative treatment" and the efficacy of such treatment); *Ortiz Torres v. Colvin*, 939 F. Supp. 2d 172, 183 (N.D.N.Y. 2013) (An ALJ "cannot discount a treating physician's opinion because the physician has recommended a conservative treatment regimen." (citing *Burgess*, 537 F.3d at 129)).

mental status examination revealed that Plaintiff has poor insight and judgment. (Pl. Mem. 14.) The Commissioner argues the ALJ properly gave "little weight" to consultative examiner Dr. Morcos' statements because they were not supported by the objective medical evidence and contradicted Dr. Chaudhry's opinion. (Comm'r Mem. 20–22.)

Even though the Court does not agree with the ALJ's finding that Dr. Morcos' opinions that Plaintiff could not make decisions, relate with others or adequately deal with stress were not supported by Dr. Morcos' other findings, the ALJ correctly relied on the opinions of Dr. Chaudhry to discount the weight afforded to Dr. Morcos' opinions.[32] *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."). As the Commissioner points out, Dr. Chaudhry opined that Plaintiff was capable of low-stress work and was only "mildly limited" in his ability to make simple, work-related decisions. (Comm'r Mem. 22 (citing R. 830, 832).) Dr. Chaudhry also found that Plaintiff was "markedly" limited in his ability to work in coordination with others. (R. 829.) Each of Dr. Chaudhry's opinions was more specific and less limiting than the blanket opinions by Dr. Marcos that Plaintiff could not make appropriate decisions, relate with others or deal with stress, and the ALJ did not err in according them greater weight given Dr. Chaudhry's treating relationship with Plaintiff. *See Harris v. Astrue*, No. 7-CV-4554, 2009 WL 2386039, at *14 (E.D.N.Y. July 31, 2009) ("The Second Circuit has repeatedly stated that when there are conflicting opinions between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight.'" (quoting *Cruz*, 912 F.2d at 13)). Moreover, Dr. Chaudhry's opinions adequately balance the evidence in the record. *Cf. Rivera v. Colvin*,

---

[32]  Indeed, Dr. Morcos found that Plaintiff had poor insight and judgment as well as specific homicidal thoughts, and assigned Plaintiff a "guarded" prognosis, (R. 523–25), which arguably translates to a limited ability to make decisions, relate with others and deal with stress.

No. 15-CV-3857, 2015 WL 9591539, at *16 (S.D.N.Y. Dec. 18, 2015) (holding that an ALJ may give greater weight to a consultative examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence" (collecting cases)).  For example, Plaintiff reported difficulty trusting others and Sartor found Plaintiff to have poor judgment and fair impulsivity, (R. 653, 655); Dr. Anderson opined that Plaintiff could "understand, concentrate, remember, adapt, relate, and persist with tasks on a sustained basis," (R. 204); during his FEDCAP examination, Plaintiff reported that he had poor concentration and an inability to "be around other people," (R. 579); Dr. Chaudhry found that Plaintiff's insight and judgment were "fair" and impulse control was "good," (R. 837); and Plaintiff reported social interactions with family and friends, and an ability to perform light shopping and use public transportation, which require minimal interactions with strangers, (R. 64, 419, 421, 515, 521, 524).

Accordingly, the ALJ did not err in according "little weight" to Dr. Morcos' opinions.

### 4. The Court cannot further assess whether the RFC assessment is supported by substantial evidence or whether the ALJ properly assessed Plaintiff's credibility

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence in the record.  (Pl. Mem. 15.)  The Commissioner argues that the ALJ properly discounted medical opinion evidence and accounted for limitations that were supported by the medical evidence by limiting Plaintiff to a "very limited range of work."  (Comm'r Mem. 22–23.)

The Court is unable to review whether the ALJ's denial of benefits was based on substantial evidence in the record because the ALJ failed to develop the record in reaching a conclusion as to Plaintiff's RFC.  *See Ayer v. Astrue*, No. 11-CV-83, 2012 WL 381784, at *7 (D. Vt. Feb. 6, 2012) (declining to address arguments as to whether the plaintiff was disabled

because the ALJ failed to adequately develop the record); *Mantovani v. Astrue*, No. 09-CV-3957, 2011 WL 1304148, at *4 (E.D.N.Y. Mar 31, 2011) (Where the ALJ fails to develop the record, "'the Court need not — indeed, cannot — reach the question of whether the [ALJ's] denial of benefits was based on substantial evidence.'" (alteration in original) (quoting *Jones v. Apfel*, 66 F. Supp. 2d 518, 542 (S.D.N.Y. 1999)). Accordingly, the Court remands for the ALJ to further develop the factual record. *See Butts*, 388 F.3d at 385 ("That is, when 'further findings would so plainly help to assure the proper disposition of [the] claim, we believe that remand is particularly appropriate.'" (alteration in the original) (quoting *Rosa*, 168 F.3d at 83)); *Mantovani*, 2011 WL 1304148, at *4.

Plaintiff also argues that the ALJ failed to assess how the medical evidence conflicted with Plaintiff's testimony or to consider any of the relevant credibility factors. (Pl. Mem. 16–18.) The Commissioner argues that the ALJ considered some of the credibility factors and Plaintiff's inconsistent statements in determining his credibility. (Comm'r Mem. 23–25.) Because the Court remands the case for further consideration of the medical evidence, the Court will not address Plaintiff's argument, as the ALJ's errors impact the Court's ability to review the credibility determination.[33]

---

[33] On remand, if the ALJ finds Plaintiff's statements inconsistent with the medical evidence after the record has been fully developed, the ALJ must then consider each of the seven factors in 20 C.F.R. § 404.1529(c)(3)(i)–(vii), and determine how they balance against one another. *See Meadors v. Astrue*, 370 F. App'x 179, 185 n.2 (2d Cir. 2010) ("[O]n remand, the ALJ should be mindful to consider each of the factors set forth in § 404.1529(c)(3)."); *Kane v. Astrue*, 942 F. Supp. 2d 301, 314 (E.D.N.Y. 2013) (finding that the ALJ erred in the credibility determination, in part because, the ALJ failed to "identify what facts he found to be significant, or indicate how he balanced the various factors" (quoting *Simone v. Astrue,* No. 08-CV-4884, 2009 WL 2992305, at *11 (E.D.N.Y. Sept. 16, 2009))).

### ii. Appeals Council new evidence

Plaintiff argues that the Appeals Council erred in rejecting the reports from Dr. Chaudhry and Dr. Sherman because both reports included new evidence which reflected Plaintiff's medical condition during the relevant period. (Pl. Mem. 19–20.) The Commissioner argues that the Appeals Council correctly determined that Dr. Chaudhry's opinion in the narrative report was duplicative of Dr. Chaudhry's December 8, 2014 report, which the ALJ considered. (Comm'r Mem. 26–27.) The Commissioner also argues that Dr. Sherman's opinion does not relate to the relevant disability period because Dr. Sherman's opinion was based on an examination that occurred after the ALJ's final decision, and therefore — despite Dr. Sherman's indication that his findings related back to February 1, 2013 — there is no basis to apply Dr. Sherman's findings retroactively. (*Id.* at 27.)

"A court reviewing the Commissioner's determination must generally base its decision 'upon the pleadings and transcript of the record.'" *Lopez v. Astrue*, No. 09-CV-1678, 2011 WL 6000550, at *10 (E.D.N.Y. Nov. 28, 2011) (first quoting 42 U.S.C. § 405(g); and then citing *Mathews v. Weber*, 423 U.S. 261, 263 (1976)). However, pursuant to the sixth sentence of 42 U.S.C. § 405(g), the court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see also Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004). Thus, remand of this type requires (1) "a showing that there is new evidence which is material" and (2) "good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 509 (S.D.N.Y. 2014) (citing 42 U.S.C. § 405(g)). Evidence is "new" if it has not been considered

previously and is "not merely cumulative of what is already in the record." *Flanigan v. Colvin*, 21 F. Supp. 3d 285, 308 (S.D.N.Y. 2014) (quoting *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)). "New evidence is considered material if (1) it is 'relevant to the claimant's condition during the time period for which benefits were denied,' (2) it is 'probative,' and (3) there is 'a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently.'" *Williams v. Comm'r of Soc. Sec.*, 236 F. App'x 641, 644 (2d Cir. 2007) (alteration in original) (quoting *Pollard*, 377 F.3d at 193). Good cause exists where the new evidence "surfaces after the Secretary's final decision and the claimant could not have obtained the evidence during the pendency of [the prior] proceeding." *Carter v. Colvin*, No. 14-CV-4970, 2015 WL 5124326, at *10 (E.D.N.Y. Sept. 1, 2015) (quoting *Lisa v. Sec'y of Dep't of Health & Human Servs.*, 940 F.2d 40, 44 (2d Cir. 1991)).

The Appeals Council erred in not considering Dr. Chaudhry's August 24, 2015 narrative report.[34] The report is "new" because it was created after the ALJ's decision. *See Pollard*, 377 F.3d at 193 ("Because the new evidence submitted by [the plaintiff] did not exist at the time of the ALJ's hearing, there is no question that the evidence is 'new' . . . ."). Although, as noted by the Appeals Council, the report includes information duplicative of the information in the record,

---

[34] The parties do not dispute whether Plaintiff must show or has shown "good cause." District courts in the Second Circuit previously were divided over whether "good cause" must be established on judicial review when a claimant submitted evidence to the Appeals Council and the Appeals Council declined to make the evidence part of the record. *See Wilbon v. Colvin*, No. 15-CV-756, 2016 WL 5402702, at *4 (W.D.N.Y. Sept. 28, 2016) (collecting cases). On January 17, 2017, 20 C.F.R. § 404.970(b) was amended to limit the Appeals Council's review of additional evidence by requiring a claimant to "show good cause for not informing us about or submitting the evidence" and listing examples of "good cause." *See* 20 C.F.R. § 404.970(b). Because 20 C.F.R. § 404.970(b) did not include a "good cause" requirement at the time of the Appeals Council's decision and neither party argues that Plaintiff must show "good cause," the Court does not address whether Plaintiff has shown "good cause."

it also includes new information that is not in the record. For example, the relevant new and non-duplicative evidence includes Dr. Chaudhry's undated diagnosis that Plaintiff suffered from Dysthymic Disorder, the finding that Plaintiff had frequent suicidal ideations with specific thoughts most days, and the finding that Plaintiff was prescribed an antidepressant in the form of an oral solution.[35] (R. 185–87.)

The contents of the report are also material and should not be precluded merely because the report was generated after, and is based in part on, treatment dates after the final ALJ decision. The report is material because it further informs the severity of Plaintiff's impairments during the disability period by providing an additional undated diagnosis and a treatment plan recorded by Dr. Chaudhry, who observed Plaintiff for approximately one year leading up to the ALJ hearing. *See Pollard*, 377 F.3d at 193–94 ("We have observed, repeatedly, that evidence bearing upon an applicant's condition subsequent to the date upon which the earning requirement [i.e., insured status] was last met is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date or may identify additional impairments which could reasonably be presumed to have been present . . . ." (citing *Lisa*, 940 F.2d at 44)).

This new information is "probative" and reasonably would have influenced the ALJ's decision regarding Plaintiff's disability. The ALJ specifically discredited a portion of Dr. Chaudhry's opinion because his treatment method was conservative, noting the lack of medication, (R. 21), and Dr. Chaudhry's report indicates medication was in fact prescribed, (R.

---

[35] It is unclear when the oral solution was prescribed. At the December 9, 2014 hearing, Plaintiff testified that he was not taking any prescription medication, (R. 58), however, that may be consistent with Dr. Chaudhry's report that Plaintiff was noncompliant with the prescription because he reported that he is "prone to headaches, vomiting and dizziness when taking any medication." (R. 186.)

186).  In addition, Dr. Chaudhry's report that Plaintiff suffered suicidal ideations "with specific thoughts most days (usually without plan or active intent)," (R. 185), further informs the severity and frequency of Plaintiff's mental health impairments, which the ALJ also called into question by limiting Dr. Chaudhry's opinion that Plaintiff would be absent from work two-to-three times a month, (R. 21).  *See, e.g.*, *Cammy*, 2015 WL 6029187, at *22 (finding psychiatric report created after the ALJ's final decision was material evidence because it provided an onset date for the plaintiff's condition and the evaluation included information as to plaintiff's mental conditions, including diagnosis and symptoms that "would have influenced the Commissioner to decide the plaintiff's application differently"); *Farnia v. Barnhart*, No. 4-CV-1299, 2005 WL 91308, at *5 (E.D.N.Y. Jan. 18, 2005) (finding a treating physician's report dated two months after the ALJ's final decision worthy of consideration because the report related to the relevant disability period, was consistent with findings in the record by the same doctor and presented a conflict with the Commissioner's findings).

By contrast, the Appeals Council properly declined to consider Dr. Sherman's reports. Unlike Dr. Chaudhry, the record contains no evidence that Dr. Sherman examined Plaintiff at any point during the disability period.  Rather, the only basis for Dr. Sherman's findings was an examination on June 12, 2015, nearly five months after the ALJ's final decision.  There is no basis to credit his assessment that Plaintiff's conditions as described in his report relate back to February 1, 2013 when Dr. Sherman had no contact with Plaintiff prior to June 12, 2015.  *See Catrain v. Barnhart*, 325 F. Supp. 2d 183, 193 (E.D.N.Y. 2004) (finding new psychiatric reports submitted based on first-time exams ten months after the ALJ's decision did not report on the plaintiff's condition at the relevant time period).  Accordingly, Dr. Sherman's findings do not relate to the period of disability.

Furthermore, Dr. Sherman's findings in the mental impairment questionnaire do not differ significantly from those of Dr. Chaudhry.  (*Compare* R. 192, 195, 828–30 (Dr. Sherman found Plaintiff "markedly" limited in ability to get along with co-workers without distracting them and work in coordination to others without being distracted by them, and opined that Plaintiff likely would be absent from work more than three times per month) *with* R. 828–30 (Dr. Chaudhry found Plaintiff "markedly" limited in ability to get along with co-workers without distracting them and ability to work in coordination and proximity to others without being distracted by them, and opined that Plaintiff likely would be absent from work between two and three times during a month).)  However, Dr. Sherman found Plaintiff "markedly" limited in seven of the nine categories of concentration and persistence, whereas Dr. Chaudhry found Plaintiff "markedly" limited in one of eight categories, (R. 829–31).  In total, Dr. Sherman's report does not present new material evidence that significantly differs from or would weigh more heavily than Dr. Chaudhry's opinions.[36]  *See Evans v. Colvin*, 649 F. App'x 35, 38 (2d Cir. 2016) (finding that new evidence was not material because it was duplicative and consistent with

---

[36] Dr. Sherman also reported a GAF score of forty-seven, (R. 190), which is slightly lower than the GAF score of fifty-five reported by Dr. Chaudhry, (R. 826).  However, the lower GAF score alone is not a sufficient reason to consider Dr. Sherman's report in light of his limited relationship with Plaintiff and the otherwise largely duplicative findings already reflected in the record by treating psychiatrist Dr. Chaudhry.  *See Diblasi v. Comm'r of Soc. Sec.*, 660 F. Supp. 2d 401, 407 (N.D.N.Y. 2009) (finding a ten-point-lower GAF score reported after the disability period not relevant for consideration because the plaintiff did not establish that it was relevant to the plaintiff's condition during the relevant period or that it would have influenced the Commissioner's decision).  Moreover, numerical GAF scores alone are considered "so general that they are not useful without additional supporting description and detail."  *Mainella v. Colvin*, No. 13-CV-2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014) ("The Social Security Administration issued a bulletin dated July 31, 2013, limiting use of GAF scores.  At a basic level, the Administration noted that '[t]he problem with using the GAF to evaluate disability is that there is no way to standardize measurement and evaluation.' . . .  The new guidance offers a number of suggestions for using GAF evidence.  Generally, the guidance instructs ALJs to treat GAF scores as opinion evidence; the details of the clinician's description, rather than a numerical range, should be used.").

evidence in the record, and the Appeals Council did not err in failing to consider the evidence);

*compare Zabala*, 595 F.3d at 409 (finding no prejudice in rejecting a treating physician's opinion

where the opinion was duplicative of evidence already in the record) *with Greek*, 802 F.3d at 376

(finding it was not harmless error for an ALJ to discredit a treating physician's opinion that the

plaintiff would miss four or more days of work per month where that opinion was not duplicative

of another treating physician's opinion in the record).

Accordingly, the evidence is not material because it is not relevant to Plaintiff's condition

during the disability period. *See Williams*, 236 F. App'x at 644 (defining materiality in part as

"relevant to the claimant's condition during the time period for which benefits were denied"

(citation and internal quotation marks omitted)). On remand, the ALJ should consider Dr.

Chaudhry's August 23, 2015 narrative report as well as any further records the ALJ obtains from

Dr. Chaudhry.

## III. Conclusion

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is granted and

the Commissioner's cross-motion for judgment on the pleadings is denied. The Commissioner's

decision is vacated, and this action is remanded for further administrative proceedings pursuant

to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge


Dated: March 24, 2017
      Brooklyn, New York